**NORTH AMERICAN PHARMACAL, INC., etc., et al., Petitioners,**

v.

**The DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE, etc., Respondent.**

**COASTAL PHARMACEUTICAL CO., INC., Petitioner,**

v.

**FOOD AND DRUG ADMINISTRATION, Respondent.**

Nos. 73–1252, 73–1386.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1973.

Decided Dec. 28, 1973.

Richard L. White, McLean, Va., for petitioners.

Howard S. Epstein, Atty., Consumer Affairs Section, Dept. of Justice, Washington, D. C., for respondents.

Before GIBSON, Circuit Judge, MOORE, Senior Circuit Judge*, and WEBSTER, Circuit Judge.

GIBSON, Circuit Judge.

Petitioners, manufacturers of anorectic drugs[1] containing amphetamines, in this original action ask for injunctive relief and to set aside an order of the Food and Drug Administration (FDA)

---

* The Honorable Leonard P. Moore, Senior Circuit Judge, Second Circuit, sitting by designation.

[1] An anorectic drug is a "substance which diminishes the appetite." *Dorland's Illustrated Medical Dictionary*, 24th Ed.

withdrawing approval of all New-Drug Applications (NDA's) covering combination amphetamine products. Jurisdiction in this court is predicated upon 21 U.S.C. § 355(h) which provides for appellate review of final orders of the Secretary of Health, Education and Welfare withdrawing approval of NDA's. In view of the serious questions presented as to our jurisdiction to entertain certain claims of the Petitioners, we will relate in some detail the background of this case.

On August 8, 1970, the Respondent, FDA, amended 21 C.F.R. § 130.46 by publishing in 35 Fed.Reg. 12652 a statement of policy dealing with amphetamines for human use. The FDA found that current labeling of these drugs did not accurately reflect the present state of knowledge regarding their usefulness, and required all such drugs to be relabeled within 60 days from the effective date of the regulation. Subsection 6 of 21 C.F.R. § 130.46 (1971) provided in part:

> Combination products labeled as required by this section are regarded as new drugs and must be subjects of approved new-drug applications.

Manufacturers of combination drugs were given one year in which to submit NDA's. The FDA received 106 NDA's but only one of the Petitioners, Eastern Research Laboratories, submitted NDA's for their drugs as required by this regulation.

On October 31, 1972, the FDA promulgated a new regulation, 21 C.F.R. § 130.-40, which made its Drug Efficacy Study Implementation Notices and Notices of Opportunity for Hearing applicable to all identical, related and similar drugs. This allowed the FDA to proceed against entire classes of drugs at one time rather than on an ad hoc case-by-case basis. This procedure was subsequently approved in Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). February 12, 1973, the FDA published in 38 Fed.Reg. 4279 its intention to withdraw NDA's covering combination amphetamine products and sent statutorily required notices to the holders of NDA's, including Petitioner Eastern Research Laboratories. The notices and conclusions on the safety and efficacy of these drugs were also, pursuant to 21 C.F.R. § 130.40, directed to and affected the Petitioners as manufacturers of the so-called "me-too" drugs, drugs similar in content and formulation to the previously approved new-drugs, which approval the FDA proposed to withdraw. Manufacturers who had submitted NDA's were notified by certified mail and other interested parties were notified of an opportunity for hearing by the Federal Register publication, provided they submitted a well-organized and full factual analysis of data in support of their opposition to withdrawal. Although five requests for a hearing were filed by other manufacturers, none of the Petitioners in this case requested a hearing during the time allowed.

March 30, 1973, the FDA published in 38 Fed.Reg. 8290 a "Notice of Withdrawal of Approval of New Drug Applications" that withdrew approval of NDA's for combination amphetamine drugs, except those for which hearings had been requested. No request for a hearing was filed by Petitioners. Subsequently, they were notified by certified mail that their products were included in the withdrawal order and were told these products could no longer be manufactured or shipped in interstate commerce, and were requested to recall all such products in the chain of distribution.

Petitioners in No. 73–1252 filed their Petition for Review with this court together with an application for a stay on April 16, 1973. We issued a temporary restraining order April 23, 1973, which was vacated upon Respondent's motion April 30, 1973. The cause was submitted to a panel of this court in St. Paul, Minnesota, June 14, 1973, at which time a stay order was entered to remain in

effect until the appeal was determined by us. In light of the Supreme Court decisions of June 18, 1973, in Weinberger v. Hynson, Westcott & Dunning, Inc., *supra*; Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235; USV Pharmaceutical Corp. v. Weinberger, 412 U.S. 655, 93 S.Ct. 498, 37 L.Ed.2d 244; CIBA Corp. v. Weinberger, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230; which deal with the powers and procedures of the FDA, we vacated our submission of the case, consolidated the Petition for Review in No. 73–1386, which had been transferred to this circuit by the Fourth Circuit, with No. 73–1252, and granted the parties an additional period of time in which to file supplemental briefs directed towards the recent Supreme Court decisions. The case is now ready for final determination by this Court.

Petitioners present three issues which they claim warrant this court's setting aside of the FDA withdrawal order of March 30, 1973. They claim: (1) the failure to give Petitioners personal notice of their opportunity for a hearing on the proposed withdrawal of approval denied them due process of law, (2) that Respondent's order was not supported by substantial evidence, and (3) that Petitioners' products were exempted from the FDA's jurisdiction by the "grandfather" clause contained in the 1962 Amendments to the Food, Drug and Cosmetic Act, 76 Stat. 788, § 107(c)(4).

*The "Grandfather" Issue*

■ Whether Petitioners' drugs were "grandfathered" by the 1962 amendments, § 107(c)(4), is initially a matter for the determination of the FDA, subject to review in a district court pursuant to the Administrative Procedure Act; hence this issue is not properly before the Court of Appeals. Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, at 653, 93 S.Ct. 2488, at 2494, 37 L.Ed.2d 235 (1973) holds:

[T]he District Court's referral of the "new drug" and the "grandfather" issues to FDA was appropriate, as these are the kinds of issues peculiarly suited to initial determination by the FDA. * * * Threshold questions within the particular expertise of an administrative agency are appropriately routed to the agency, while the court holds its hand.

That review of such an order is in the district court and not the Courts of Appeals is made explicit in Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 627, 93 S.Ct. 469, 2482, 37 L.Ed.2d 207 where the Court said:

Some manufacturers, however, have no NDAs in effect and are not seeking approval of any drugs. Nevertheless, FDA may make a declaratory order that a drug is a "new drug". While that order is not reviewable in the Court of Appeals under § 505(h), it is reviewable in the District Court under the Administrative Procedure Act.

We think that the FDA's order of August 8, 1970, 21 C.F.R. § 130.46 (1971), was such a declaratory order. In it Petitioners were advised that drugs relabeled as required by that regulation are regarded as "new drugs" and must be subjects of approved NDA's. It is the FDA's position that such relabeling destroys the grandfather exemption since § 107(c)(4) requires that the drug be intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to the drug on October 9, 1962. Whatever the proper determination on the merits, it is clear that the procedure Petitioners must follow to obtain a determination of the grandfather status of their drugs is a decision by the FDA with judicial review, if desired, in a district court, not the Court of Appeals.

*The Substantial Evidence Claim*

The FDA maintains that we are without jurisdiction to review the merits of Petitioners' Petition for Review as the manufacturers are "me-too"

manufacturers [2] and not holders of an NDA, except for Eastern Research Laboratories, to be discussed later. FDA argues that the Supreme Court's decision in *Bentex* requires "me-toos" to seek review in a district court. While the Supreme Court decision in *Bentex* on this point is not entirely clear, we think *Bentex*, on the contrary, establishes the right of these manufacturers to seek review in a Court of Appeals. The Supreme Court in *Hynson, supra,* 412 U. S. at 627, 93 S.Ct. at 2482, said "[FDA's] determination that a product is a 'new drug' or a 'me-too' drug is, of course, reviewable." *Bentex* then establishes where review of that type of FDA order may be sought.

■ Orders which do not deny or withdraw an NDA are reviewable under the Administrative Procedure Act, if they declare a "new drug" status. *Bentex, supra,* 412 U.S. at 651, 93 S.Ct. 2488. Implicit in this is that an order declaring a "me-too" status is also one reviewable under the Administrative Procedure Act due to the language previously quoted from *Hynson*. Further, the Supreme Court in *Bentex* noted that "an order denying an NDA and withdrawing one is reviewable by the Court of Appeals * * *." [3] Rather than establishing that Petitioners as "me-too" manufacturers cannot seek review of a withdrawal order in the Court of Appeals as argued by the FDA, *Bentex* establishes the propriety of review in the Court of Appeals.

> While § 505(h) [21 U.S.C. § 355(h)] would appear to be the exclusive method of obtaining judicial review of FDA's order withdrawing an NDA covering *the instant drugs,* the Government apparently did not oppose the District Court's taking jurisdiction nor appeal from its action * * *. (emphasis supplied).

*Bentex, supra* at 635, 93 S.Ct. at 2493.

■ All the petitioners in *Bentex* were "me-too" manufacturers and the use of the emphasized words "the instant drugs" would indicate a disposition on the part of the Supreme Court to afford affected "me-too" manufacturers judicial review of the withdrawal order covering their "me-too" drugs.

■ Respondent further argues that Eastern Research Laboratories must be dismissed as it is an NDA holder having its principal place of business in Maryland. Therefore, its only appellate remedy is in the Fourth Circuit or the District of Columbia Circuit. The FDA recognizes that jurisdiction over at least some of the petitioners is properly in the Eighth Circuit by terms of § 355(h). Further, No. 73–1386 is here on a transfer from the Fourth Circuit since it presents identical questions. We think it is proper in the interest of expediting decision and conserving judicial resources for this Court to determine the questions presented on behalf of all the Petitioners. Pursuant to Rule 2, Fed.R.App.P., this Court will treat the Petition for Review on behalf of all Petitioners not having a principal place of business within this Circuit as requests to intervene under Rule 15(d), Fed.R.App.P., which requests are hereby granted. We turn now to the merits.

Petitioners claim that the FDA's order of March 30, 1973, was not supported by substantial evidence, but admit in their brief that "there is a lack of long term study of anorectic drug therapy and a need for such study exists. The question of whether the use of anorectic drugs * * * leads to drug abuse or dependence has also been left unanswered due to the scanty and indirect data." [4] Further, they argue that "[c]linical studies and facts before the Commissioner were scanty and incomplete." [5]

■■ As the FDA correctly argues, Petitioners' admissions defeat their

---

2. "Me-too" manufacturers are ones which have identical, similar, or related drugs covered by their own or another manufacturer's NDA.

3. *Bentex, supra* at 651, 93 S.Ct. at 2493.

4. Petitioners' main brief at 13.

5. Petitioners' main brief at 14.

claim on the merits. The statutory scheme requires that the manufacturers must carry the burden of showing by substantial evidence the claimed efficacy and safety of their drugs. 21 U.S.C. § 355(e). *Hynson, supra,* 412 U.S. at 617, 93 S.Ct. 2469; Upjohn Co. v. Finch, 422 F.2d 944, 955 (6th Cir. 1970). Here, the Petitioners admit that the data was scanty and incomplete. Therefore, their burden of showing by substantial evidence that their drugs were safe and effective was not met and the withdrawal order was required by 21 U.S.C. § 355(e).

*The Notice Requirement*

Petitioners argue that they were deprived of due process by the FDA's failure to give them personal notice of their opportunity for hearing before a withdrawal of the NDA's covering combination amphetamines. The FDA asserts it is only required to give personal notice to holders of NDA's. The question presented is an important one; what type of notice must the FDA give manufacturers of "me-too" drugs in order to subject their products to the consequences of a withdrawal order? As stated in *Hynson, supra,* 412 U.S. at 625, 93 S.Ct. at 2481:

FDA maintains that a withdrawal of any NDA approval covers all "me-too" drugs. For the reasons stated that procedure is a permissible one where every manufacturer of a challenged drug has an opportunity to be heard.

We are of the view that publication in the Federal Register gives "me-too" manufacturers sufficient opportunity to be heard. 44 U.S.C. § 1508 provides in pertinent part:

A notice of hearing or of opportunity to be heard, required or authorized to be given by an Act of Congress, or which may otherwise properly be given, shall be deemed to have been given to all persons residing within the States of the Union and the District of Columbia, except in cases where notice by publication is insufficient in law, when the notice is published in the Federal Register * * *.

■ Therefore, unless the notice provided by 38 Fed.Reg. 4279 is "insufficient in law" we must find that petitioners received notice of an opportunity to be heard. That is all that due process or the Administrative Procedure Act requires. In determining whether the notice is "insufficient in law" the pertinent statutory provision is 21 U.S.C. § 355(g) which provides:

Orders of the Secretary issued under this section shall be served (1) in person by any officer or employee of the department designated by the Secretary or (2) by mailing the order by registered mail addressed to the *applicant* or *respondent* at his last-known address in the records of the Secretary. (emphasis supplied).

■ We think that "applicant" or "respondent" referred to in § 355(g) must be read as referring only to holders of NDA's. Until the Drug Listing Act of 1972, 86 Stat. 559, P.L. 92–387 (August 16, 1972) becomes fully effective, it is only holders of NDA's who have a last known address in the records of the Secretary. We do not think that § 355(g) imposes upon the Secretary the duty to personally notify manufacturers of "me-too" drugs, nor does due process or the APA require it. Notice was given in the most effective and practical manner available to the FDA. As we recognized in Amalgamated Meat Cutters v. Allen, 423 F.2d 267, 269 (8th Cir. 1970), all that is required is that:

The notice involved was reasonably calculated to apprise the interested party of the pendency of the action and afforded * * * an opportunity to present its position and objections.

Eastern Research Laboratories did receive notice by certified mail as it had submitted NDA's in compliance with 21 C.F.R. § 130.46 (1971); if the remaining Petitioners had also complied, it is not disputed that they would also have received personal notice. It was Peti-

tioners' own decision not to submit NDA's for their drugs. Undoubtedly, the status of being a "me-too" is desirable as it eliminates the necessity of having to file and pursue an NDA; that it creates a possibility that a "me-too" will not receive actual notice of proposed actions affecting the pertinent NDA's is a risk which "me-toos" must be held to have accepted.

Since the "me-toos" are riding on the backs of the NDA's and thus vicariously receive the benefits of the NDA's approval, it is incumbent upon the "me-too" drug manufacturers to keep advised of the status and the validity of the NDA's that form the basis for the manufacture and distribution of their "me-too" product. The "me-too" rights to distribute in interstate commerce should certainly be no greater than the rights of the NDA's to so distribute. Notice in the Federal Register is calculated to reach all such "me-too" manufacturers who, because of their dependence for validity upon the NDA's, should be required, both as a matter of self-interest and of law, to keep abreast of the FDA regulations affecting their products. Under these circumstances, it should not be incumbent upon the FDA to ferret out the "me-too" manufacturers. Rather, the "me-toos" should be in the forefront, ready to come forth to protect their own interest and supply the necessary data and information to support the safety and efficacy of their products. Their failure to do so was at their peril.

The paramount needs of the public require that unsafe or ineffective drugs should be removed from the market. The congressional regulatory scheme contained in the 1962 Amendments to the Pure Food and Drug Act requires a positive affirmative showing that chemicals sold to the public in prescription form should be both safe and efficacious and the burden of proving these facts rests upon the manufacturers. We therefore find that Petitioners did receive notice sufficient in law of an opportunity to be heard and the failure to personally notify each Petitioner did not deprive them of due process.

The Petitioners have failed to demonstrate any error in the FDA's procedures in issuing the challenged order. Therefore, our stay order of June 14, 1973, is vacated and the Petitioners' request to have the March 30, 1973, order of the FDA set aside is denied.

Relief denied.